IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

THE EDGE IN COLLEGE
PREPARATION,
LLC, a New York limited liability
company,

        Plaintiff and
        Counterclaim
        Defendant,

vs.

PETERSON'S NELNET, LLC, a
Nebraska limited liability company,

        Defendant and
        Counterclaimant.

8:16-CV-559

MEMORANDUM AND ORDER

The parties in this lawsuit are generally in the business of test preparation for college entrance exams. Filing 100 at 1. The plaintiff, the Edge in College Preparation, agreed to write an ACT test preparation manuscript for the defendant, Peterson's Nelnet. Filing 111-9 at 23; *see also* filing 111-9 at 1-25. But at some point, Nelnet decided it no longer wanted to work with the Edge. Now, the Edge is suing Nelnet for allegedly breaching its contractual obligations and infringing on the Edge's copyrighted work. Filing 76 at 3-8. Nelnet has filed a counterclaim arguing that the Edge, too, breached the parties' agreement. Filing 77 at 9-10.

This matter is before the Court on the parties' cross-motions for summary judgment (filing 93 and filing 99). For the reasons set forth below, the Court will grant the Edge's motion for partial summary judgment (filing

93) in part and deny it in part. The Court will also deny Nelnet's motion for summary judgment (filing 99) in its entirety.

## BACKGROUND

Jessica Davidoff is the sole member of the Edge in College Preparations, a New York limited liability company. The Edge specializes in providing one-on-one tutoring for high school students taking college entrance exams such as the ACT or SAT. Filing 101 at 1. Peterson's Nelnet is generally in the business of creating test guides and study materials for students taking those same college entrance exams. Filing 101 at 1-2.

After a series of negotiations, the Edge and Nelnet entered into a Publishing Agreement. Filing 111-2 at 12-14; filing 111-9 at 1. Under that agreement, the Edge promised to write the manuscript for Nelnet's 2016 ACT Preparation Guide, in several batches. Those batches were deliverable to Nelnet on a periodic basis from July 2015 to December 2015. Specifically, the Edge agreed to submit the following portions of work "in a form ready for review": (1) Introductory Material (2) English, (3) Math, (4) Reading, (5) Science, and (6) Essay Samples. Filing 111-9 at 5; filing 112-3; filing 112-8 at 1-2. In return, Nelnet agreed to pay the Edge $60,000 within ten days of the execution of the agreement, another $60,000 on September 1, 2015, and a final $60,000 upon final written acceptance of the Edge's work. Filing 95-18 at 5.

But as soon as the Edge submitted its first "batch" of the manuscript—introductory material—a dispute arose. Filing 101 at 13. According to Nelnet, the manuscript was not the quality of work Nelnet anticipated or expected. Filing 101 at 13. Specifically, Nelnet claims that the Edge omitted material required under the parties' agreement, and the work that was submitted was woefully inadequate. Filing 101 at 13. Nelnet expressed its concern with the

quality of the manuscript and gave the Edge the opportunity to revise its work and submit a second draft. Filing 101 at 14. The Edge agreed to do so, and submitted a revised version of the introductory material on July 22, 2015. Around the same time, the Edge turned in its next batch of the manuscript—English. Filing 101 at 14.

But after receiving the Edge's revised "batch one" submission and the second batch of the manuscript, Nelnet decided to exercise its right to terminate the parties' agreement. Filing 112-13 at 2. That intention was orally communicated to the Edge and further confirmed through a series of emails on August 10, 2015. Filing 95-3 at 44-45; filing 112-13 at 2; *see also* filing 111-3 at 47. Specifically, in one email communication, Nelnet told the Edge that it would be "working on the official Termination Notice with [its] legal counsel," but that the Edge should "consider this response confirmation to our conversation and termination." Filing 95-3 at 41.

A few days later, but before sending the Edge an "official" termination notice, Nelnet initiated discussions with a different author, Red Letter Content. Filing 111-4 at 12. Specifically, on August 13, 2015, Nelnet's managing editor sent Red Letter Content an email that attached both batches of the Edge's manuscript. Filing 95-3 at 49. In this email, Nelnet asked Red Letter Content to "take a look [at the Edge's manuscript] and give [Nelnet] an evaluation on what you think you could repurpose from these sections and use in the book you are currently writing for us." Filing 95-3 at 50. After reviewing the Edge's manuscript, Red Letter Content agreed to write the manuscript for Nelnet's 2016 ACT Preparation Guide. Filing 95-2 at 44.

On August 17, 2015—the same day that Nelnet finalized its new agreement to work with Red Letter Content, *see* filing 95-2 at 44—Nelnet also sent the Edge a letter that, at least in Nelnet's view, purported to amend the

parties' Publishing Agreement. Filing 112-15 at 3. That letter gave the Edge two options: it could either "pay to [Nelnet] the sum of $51,000" or

> enter into (and execute and deliver) a separate agreement mutually acceptable to both [the Edge] and [Nelnet] pursuant to which [the Edge] will commit to develop and deliver to [Nelnet] a manuscript for a derivative work entitled "Countdown to the ACT" (or a similar title), the necessary effort and work with respect to which will be commensurate with a work for which [Nelnet] would be willing to pay the sum of approximately $60,000.

Filing 112-15 at 3.

The Edge rejected both proposed amendments in an August 18 response letter. Filing 112-16. There, the Edge acknowledged Nelnet's right "pursuant to Section 8 of the Agreement . . . to exercise its discretion to terminate" the agreement. Filing 112-16 at 13. But the Edge also noted that Nelnet had terminated the parties' agreement on August 10, 2017 when it provided the Edge with confirmation of termination. Filing 112-16 at 13. Based on its understanding of the August 10 conversation, the Edge explained its position that although Nelnet would not be required to pay the Edge any additional payments, the Edge would retain the $60,000 it already received from Nelnet for its work on the first two batches of the manuscript. Filing 112-16 at 13

Once Nelnet and the Edge officially parted ways, this litigation ensued. According to the Edge, much of its allegedly unworkable content actually ended up in Nelnet's final preparation guide. *See* filing 76 at 6. Based on the substantial similarities between the two works, the Edge sued Nelnet for copyright infringement. The Edge also claims that Nelnet breached the parties' Publishing Agreement by terminating the contract without "affording [the

Edge] the reasonable opportunity to improve or correct" the manuscript. Filing 76 at 6. Nelnet filed its own breach of contract counterclaim, alleging that the Edge breached the terms of the parties' original Publishing Agreement by not providing Nelnet with quality work. Filing 77 at 7.

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County*, 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC*, 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson,* 643 F.3d at 1042.

DISCUSSION

## I. BREACH OF CONTRACT

The parties have moved for summary judgment on various contractual allegations concerning the parties' Publishing Agreement. Filing 93; filing 99. Under Nebraska law, to recover in an action for breach of contract, the plaintiff must prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty. *Solar Motors v. First Nat. Bank of Chadron,* 545 N.W.2d 714 (Neb. 1996).

Neither party disputes the validity of the agreement, but the parties do generally dispute whether the terms of that agreement were breached. *See* filing 93; filing 99. More specifically, Nelnet argues that because the Edge failed to submit a complete, quality work product, the Edge necessarily breached the terms of its agreement. And the Edge, for its part, claims that Nelnet breached the agreement when it terminated the parties' obligations without giving the Edge the opportunity to revise its manuscript. The Court will consider each of those arguments in turn below.

### (a) The Edge's Breach of Contract Claim

Nelnet claims that it is entitled to summary judgment on the Edge's breach of contract claim for at least two reasons. First, Nelnet contends that the Edge, rather than Nelnet, actually terminated that agreement, warranting dismissal of the Edge's breach of contract claim. *See* filing 101 at 21. Alternatively, Nelnet argues that even if it did terminate the Publishing Agreement, that termination cannot, as a matter of law, amount to a breach of

the agreement because Nelnet could terminate the parties' obligations at its sole discretion. Filing 101 at 7.

Nelnet's former contention is easily disposed of. According to Nelnet, it did not breach the terms of the Publishing Agreement. Filing 112-15 at 1. That is true, Nelnet contends, because its August 17, 2015 letter is not a termination, but rather, a modification of the parties' agreement.[1] Filing 112-15 at 1. In support of that argument, Nelnet points out that it gave the Edge two options for modification: the Edge could either execute a separate agreement agreeable to both parties, or pay back a portion of the funds it already received under the initial Publishing Agreement. Filing 112-15 at 3. So, Nelnet concludes, the Edge actually terminated the Publishing Agreement by rejecting those modifications.

The problem with that argument, though, is that either option necessarily requires the termination of the original Publishing Agreement: that is, the Edge could either (1) execute a separate agreement for a smaller manuscript (*i.e.*, terminating the initial Publishing Agreement), or (2) the Edge could pay back the funds it received from Nelnet for its promise to deliver a satisfactory manuscript under the initial agreement (*i.e.*, terminating the parties' obligation under the Publishing Agreement). And that construction of Nelnet's August 17 letter makes sense when considering the letter in its entirety. *See generally Eastep v. Nw. Nat. Life Ins. Co.*, 208 N.W. 632, 634 (Neb. 1926). Indeed, an earlier paragraph of that letter makes it clear that the Edge "shall not be obligated to furnish any more services or deliver any further or

---

[1] Nelnet's argument is taken for what it is worth. In a subsequent brief opposing the Edge's motion for summary judgment on its copyright infringement claim, Nelnet explicitly admits that it "terminated the Contract, at the earliest, on August 17, 2015, when it mailed written notice to [the Edge], as expressly required by the Contract." Filing 116 at 6.

additional portions of the Work to [Nelnet] under the Agreement," and Nelnet "shall not be obligated to furnish any more services or pay any further or additional amounts of money to [the Edge] under the Agreement." Filing 112-15 at 3.

In other words, the August 17 letter does not modify the terms of the Publishing Agreement: instead, it makes clear that the parties' obligations under the *original* agreement are terminated.[2] So, to the extent that Nelnet's motion for summary judgment rests on a construction of its August 17 letter as a "modification," that motion will be denied. *Solar Motors*, 545 N.W.2d at 721.

Nelnet's alternative argument, that it cannot be liable under the Edge's contract theory because the contract permitted Nelnet to part ways with the Edge, fares somewhat better, but still ultimately fails at this point of the proceeding. To support why, in its view, it did not breach the terms of the parties' agreement, Nelnet points to § 8 of the parties' Publishing Agreement. Under § 8, if

> the manuscript delivered [by the Edge] is not satisfactory to [Nelnet] at its sole discretion, [Nelnet] may at its option and its sole discretion terminate this agreement by notice in writing mailed to the [Edge's] last known address, in which case [the Edge] shall be assigned all rights to created by [the Edge] for the

---

[2] To be clear, and as the Court will explain in more detail below, there is some dispute as to whether Nelnet actually terminated the parties' agreement on August 10, 2015. But whether the August 17 letter is construed as a confirmation of prior termination or as a final termination, there can be no dispute that it is *not* a modification.

manuscript. . . . If the [Edge] agrees to finish, correct, or improve the Work and if the revised version of the work, once delivered, is not satisfactory to [Nelnet] at its sole discretion (or if [the Edge] is unwilling to make further changes), [Nelnet] may avail itself of the remedies set forth in this paragraph 8.

Filing 111-9 at 10.

According to Nelnet, § 8 provided it with two options in the event that it determined the Edge's manuscript was not satisfactory: (1) Nelnet could unilaterally terminate the agreement or (2) Nelnet could offer the Edge the opportunity to revise the manuscript. Filing 101 at 7. Under the latter option, if the Edge agreed to revise the manuscript, Nelnet could still terminate the agreement if the revised portion remained unsatisfactory. Filing 101 at 7. The Edge, on the other hand, reads § 8 as giving Nelnet a right to terminate the agreement *only* if Nelnet determines the Edge's *revised* manuscript is unsatisfactory. Filing 118 at 13. That is, according to the Edge, it had the absolute right to make revisions to its initial manuscript before Nelnet could terminate the agreement.

But the Edge's understanding of § 8 defies basic principles of contract interpretation. It is a fundamental rule of contract law that "words must be given their plain and ordinary meaning as reasonable persons would understand them." *Kreikemeier v. McIntosh*, 391 N.W.2d 563 (Neb. 1986). And here, the plain understanding of the words "if" and "agree" undermine the Edge's construction of § 8. Filing 111-9 at 10.

To begin with, the word "if" describes a contingency—that is, whatever follows might or might not happen. *If*, New Oxford American Dictionary (2nd ed. 2005). Here, the contingency of § 8 is that Nelnet could determine the manuscript is not satisfactory. If that occurred, Nelnet had two options, one

9

explicit and one implicit. One option, which was clearly articulated by the parties, is that Nelnet could terminate the agreement. Filing 111-9 at 10. Another option, clearly implied, is that Nelnet could ask the Edge to make revisions. *See* filing 111-9 at 10. If the Edge agreed to improve the manuscript, Nelnet could still terminate the parties agreement if, in Nelnet's view, the revised manuscript was still unsatisfactory. *See* filing 111-9 at 10. Any other reading of the "if" statements in § 8 would render at least half of that provision superfluous. *See Reisig v. Allstate Ins. Co.*, 645 N.W.2d 544, 551 (Neb. 2002).

And that interpretation of § 8 is bolstered by the word "agree" in the parties' latter option. *Agree*, New Oxford American Dictionary (2nd. ed. 2005) (defining agree as the "consent to do something that has been suggested by another person"). That definition necessarily implies that, under these circumstances, Nelnet must have offered the Edge the opportunity to revise its manuscript before the Edge could agree to the revision. After all, the Edge could not trigger the right to revise the manuscript by agreeing with itself. So, based on the plain language of § 8 and general rules of contract interpretation, Nelnet could terminate the agreement without affording the Edge the opportunity to revise its manuscript if Nelnet determined the manuscript was not satisfactory.[3]

Even if the Court were, for sake of argument, persuaded by the Edge's interpretation of § 8 of the Publishing Agreement, it is undisputed that Nelnet *did* allow the Edge to revise its "batch one" submission. Filing 111-2 at 98-99.

---

[3] That conclusion is also bolstered by the Edge's own statements in the days following Nelnet's termination of the agreement. Indeed, in the Edge's August 18, 2015 response letter, it noted that the Edge "has not disputed that pursuant to Section 8 of the Agreement, [Nelnet's] remedy for performance concerns identified by [Nelnet] is termination." Filing 95-19 at 6.

After Nelnet submitted its "batch one" revisions, Nelnet informed the Edge that despite those revisions, the manuscript "is still not at the level [Nelnet] thought it would be this time around." Filing 112-9 at 1. Nelnet also told the Edge that "we are finding issues with grammar, organization, and spelling just to name a few. . . [we] cannot afford to have manuscript come in with these types of errors." Filing 112-9 at 1. And if the Edge's unsatisfactory revisions were, in fact, the catalyst for Nelnet's decision to terminate the agreement, then even by the Edge's own interpretation, Nelnet's remedy would be termination. *See* filing 111-9 at 10; *see also* filing 95-19 at 6.

Even so, that does not mean that summary judgment is warranted. Indeed, despite Nelnet's statements about the poor quality of the Edge's manuscript, the record also includes evidence from which a reasonable jury could conclude that Nelnet might have actually been satisfied with the Edge's work on the manuscript. *See* filing 118 at 14; filing 95-23 at 1; filing 95-3 at 10. For example, after the Edge submitted its revised manuscript to Nelnet, Nelnet took steps to further solidify the parties' relationship by initiating negotiations about leasing the Edge's online training and study videos. Filing 118 at 15; filing 95-23 at 1. Nelnet's editorial team also congratulated its staff on "steering the ship back on course." *See* filing 95-19 at 2.

And even after Nelnet informed the Edge that it would be terminating the parties' agreement, Nelnet sought to retain the copyright in that work and forwarded the allegedly deficient work to Red Letter Content to "[l]icense as-is." Filing 95-3 at 10. That evidence, the Edge argues, creates factual questions for the jury to resolve. Indeed, why would Nelnet want to retain the copyright or license a work that, in its view, was so inadequate it warranted termination of the agreement? And why, as the Court will explain in more detail below, did portions of that allegedly deficient manuscript appear in

Nelnet's final publication? *Compare* filing 112-2 at 1-33 *with* filing 103-4 at 1-37. Those questions are for the jury to decide. So, the Court will deny Nelnet's motion for summary judgment on the Edge's breach of contract claim.

### *(b) Nelnet's Breach of Contract Counterclaim*

The Edge moves for summary judgment on Nelnet's breach of contract counterclaim. Filing 94 at 17. According to the Edge, Nelnet's counterclaim necessarily fails because the contract provides "no provision to which [Nelnet] can point as having been breached." Filing 94 at 17. Nelnet, on the other hand, argues that there is evidence to support its contention that the Edge breached the terms of the Publishing Agreement. More specifically, Nelnet claims that there is evidence, if believed by a jury, from which a reasonable fact finder could determine that the Edge breached the Publishing Agreement by failing to submit its manuscript "in a timely manner, having been carefully edited for content" and in a form "ready for review." Filing 111-9 at 16; filing 111-7 at 15.

The Court agrees. As explained in the previous section, there is evidence from which a reasonable jury could conclude that the Edge did not submit a satisfactory work product. And that conduct would at least arguably breach the Edge's obligation under the agreement to submit its manuscript in a form "ready for review." Filing 111-9 at 16; *see also* filing 116 at 20. So, the Court will deny the Edge's motion for summary judgment on Nelnet's counterclaim.

### II. COPYRIGHT INFRINGEMENT

The parties have also filed cross-motions for summary judgment on the Edge's copyright infringement claim. Specifically, Nelnet argues that the Edge's copyright infringement claim necessarily fails because no reasonable jury could conclude that Nelnet's final 2016 ACT Preparation Guide is

substantially similar to the Edge's copyrighted manuscript. Filing 101 at 26. The Edge, on the other hand, claims that the undisputed evidence demonstrates that Nelnet infringed on its copyright on at least two occasions— first when Nelnet distributed the Edge's copyrighted work to Red Letter Content, and again when the Edge's copyrighted manuscript was incorporated into Nelnet's final publication. *See* filing 94 at 13.

The Court will begin with the Edge's contention that it is entitled to summary judgment on its first allegation of copyright infringement: the distribution of the Edge's manuscript to Red Letter Content. As a threshold matter, however, Nelnet contends that claim is not even an issue in this litigation. That is true, Nelnet argues, because the Edge failed to adequately plead the Red Letter Content infringement. Filing 116 at 14.

But that argument is without merit. After all, the operative complaint specifically alleges that Nelnet "used, reproduced and/or distributed the copyrighted Work." Filing 76 at 6. And that allegation clearly places Nelnet on notice of the Edge's contention that Nelnet infringed on its copyright when it "distributed that copyrighted Work" to Red Letter Content on August 13, 2015. Filing 76 at 6; *see Hamilton v. Palm*, 621 F.3d 816, 818 (8th Cir. 2010); Fed. R. Civ. P. 8(a)(2). So, the relevant question before the Court is whether a genuine dispute of material fact exists on this allegation of copyright infringement.

To establish its claim for copyright infringement, the Edge must prove (1) it owns a valid copyright; (2) that Nelnet had access to the copyrighted material; and (3) there is a substantial similarity, in both ideas and expression, between the Edge's manuscript and Nelnet's final publication. *Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 119 (8th Cir. 1987); *see also McCulloch v. Albert E. Price, Inc.*, 823 F.2d 316, 318 (9th Cir. 1987). Nelnet does not dispute the fact that it forwarded the Edge's manuscript to Red Letter Content. Filing

112-17 at 1-2. But Nelnet does dispute the Edge's contention that it owned a valid copyright in the distributed material at the time of the alleged infringement. *See* filing 116 at 14. More specifically, Nelnet argues that under § 3 of the parties' Publication Agreement, the Edge agreed to assign "the copyright and all the exclusive rights comprised in the copyright in the Work and all revisions thereof, including, but not limited to, the exclusive right to publish, reproduce, display, and distribute the Work. . . ." to Nelnet. Filing 111-9 at 5. And given that language, Nelnet contends that whatever copyright the Edge may have had in its manuscript belonged to Nelnet on August 13, 2015.

According to the Edge, however, the parties' agreement also included language providing that if Nelnet exercised its right to terminate the agreement, "all rights transferred to [Nelnet] by this agreement shall immediately revert to the [Edge]." Filing 95-14 at 5. And because, in the Edge's view, Nelnet terminated the agreement before it distributed the manuscript to Red Letter Content, the Edge contends it cannot be disputed that Nelnet infringed on the Edge's valid copyright when it distributed the manuscript. Filing 118 at 18.

Determining which party owned the copyright at the time of the alleged infringement, however, requires the resolution of a factual dispute underlying much of this litigation: on what date did Nelnet actually terminate the Publishing Agreement? If the agreement was terminated on August 10, 2015 as the Edge contends, then the Edge owned the copyright to the manuscript on August 13 when Nelnet distributed that material. On the other hand, if Nelnet did not terminate the parties' agreement until August 17, as it contends, then Nelnet would have been assigned the copyright at the time of the August 13 distribution. So, ruling on the Red Letter Content infringement necessarily

requires the Court to take a brief detour through the arguments with respect to termination of the Publishing Agreement.

As briefly noted above, the Edge contends Nelnet terminated the parties' agreement on August 10 when it notified the Edge of its intent to terminate to do so by both telephone and email. *See* filing 116 at 3. More specifically, the Edge points out that on August 10, 2015 Nelnet sent the Edge an email informing the Edge that it should "consider this response as confirmation of our conversation and termination." Filing 112-13 at 1. That conduct, the Edge argues, necessarily terminated the parties' obligations under the Publishing Agreement. But Nelnet claims that its August 10 communications cannot, as a matter of law, terminate the Publishing Agreement. That is true, Nelnet argues, because the parties agreed that a termination notice must be "in writing [and] mailed to [the Edge.]" Filing 111-9 at 10. And because it did not mail a final termination notice until August 17, in Nelnet's view, the Publishing Agreement could not have been terminated before that date.

But the Court is not persuaded by Nelnet's technical argument. Indeed, Nebraska law generally follows the Restatement of Contracts (Second) §§ 1–385 (1981). *See Lee Sapp Leasing, Inc. v. Catholic Archbishop of Omaha*, 248 540 N.W.2d 101, 104–105 (Neb. 1995); *Whorley v. First Westside Bank*, 485 N.W.2d 578, 582 (Neb. 1992); *Spittler v. Nicola*, 479 N.W.2d 803, 807–08 (Neb. 1992); *Rosnick v. Dinsmore*, 235 Neb. 738, 748, 457 N.W.2d 793, 799 (Neb. 1990). And under the Restatement of Contracts (Second), clauses requiring contract termination to be in writing, such as the provision at issue here, are not necessarily determinative. "[A] self-imposed limitation does not limit the power of the parties subsequently to contract." Restatement of Contracts (Second) § 283 cmt. b (2019). "Even a provision of the earlier contract to the effect that [the agreement] can be rescinded only in writing does not impair

the effectiveness of an oral agreement of recession." *Id; See also* Joseph M. Perillo, Corbin on Contracts § 7.14 (1993); E. Allan Farnsworth, Farnsworth on Contracts § 7.6 (2003).

Based on that understanding, it is possible that Nelnet terminated the agreement before Nelnet mailed the August 17, 2015 letter. But determining the date of termination requires the fact finder to evaluate the objective intent of the parties' communications. *See generally Viking Broad. Corp. v. Snell Pub. Co.*, 497 N.W.2d 383, 384 (Neb. 1993). And after careful review of the evidence, a reasonable jury could construe Nelnet's August 10 telephone call and email communications with the Edge as terminating the parties' agreement. *See id.* But a reasonable fact finder could also conclude that Nelnet did not terminate the parties' agreement until August 17. *Id.*

And because a dispute of material fact exists as to the date Nelnet terminated the agreement, summary judgment is not appropriate with respect to the alleged Red Letter Content distribution. *Hartman*, 833 F.2d at 119. Accordingly, the Court will deny the Edge's motion for summary judgment with respect to its first copyright infringement claim.

That brings the Court to the Edge's second allegation of copyright infringement—its contention that Nelnet's 2016 ACT Prep Guide: The Ultimate Guide to Mastering the ACT (and all subsequent versions of that publication) infringed on the Edge's copyright. With respect to this allegation of infringement, the parties dispute neither that the Edge owned a valid copyright in this material, nor that Nelnet had access to this material.[4] But the parties do disagree on the issue of substantial similarity. *Hartman*, 833 F.2d at 119.

---

[4] At this point, it is undisputed that the parties had terminated the Publishing Agreement, and the Edge's copyright in its manuscript had reverted back to the Edge. Filing 101 at 26.

To establish substantial similarity, there must be similarity, both in ideas and expression, between the original elements of the Edge's manuscript and the final publication. *Schoolhouse, Inc. v. Anderson*, 275 F.3d 726, 729-30 (8th Cir. 2002). Determination of substantial similarity involves a two-step analysis. . *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 732 (8th Cir. 2006). There must be substantial similarity both of ideas and of expression. *Id.* Similarity of ideas is evaluated extrinsically, focusing on objective similarities in the details of the works. *Id.* If the ideas are substantially similar, then similarity of expression is evaluated using an intrinsic test depending on the response of the ordinary, reasonable person to the forms of expression. *Id.* In other words, the Court must first consider whether the general idea of the works is objectively similar (*i.e.*, the "extrinsic" portion of the test) and then determine whether there is similarity of expression (*i.e.*, the "intrinsic" portion of the test). *See Taylor Corp. v. Four Seasons Greetings*, LLC, 315 F.3d 1039, 1043 (8th Cir. 2003).

### (i) Extrinsic Similarity

To begin, the extrinsic inquiry is an objective one, looking only "to the specific and external criteria of substantial similarity between the original elements (and only the original elements) of a protected work and an alleged copy." *Copeland v. Bieber*, 789 F.3d 484, 489 (4th Cir. 2015) (internal quotations omitted). And because it is focused only on the original elements of the copyrighted work, when examining extrinsic similarity, the fact finder must first engage in "analytic dissection," separating out those parts of the work that are original and protected from those that are not. *Id.*; *see Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000); *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1257 (11th Cir. 1999). In other words, extrinsic similarity cannot be shown by cherry-picking common ideas between the

works—at least, not without considering whether those common ideas are original, copyrightable elements of the copyrighted works. *See Universal Furniture Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 436 (4th Cir. 2010); *see also Herzog*, 193 F.3d at 1257.

Here, Nelnet argues that the identical elements of the two works, if any, are not copyrightable. Filing 101 at 29. More specifically, Nelnet argues that the Edge's manuscript is largely made up of facts, not original expression. And because original works are copyrightable, but facts are not, Nelnet argues that the Edge cannot demonstrate extrinsic similarity. *Feist Publ'ns, Inc. v. Rural Tel. Serv., Co.*, 499 U.S. 340, 344-45 (1991); *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. In*c., 893 F.3d 1176, 1185 (9th Cir. 2018); *Schoolhouse*, 275 F.3d at 729-30.

But facts are entitled to copyright protection when they are arranged or selected in such a way that the resulting work as a whole constitutes an original work of authorship. *Schoolhouse*, 275 F.3d at 728. And here, the manner in which the Edge selected and arranged various information—specifically, in the way the Edge determined would be helpful for students studying for the ACT—is entitled to copyright protection. *See Feist*, 499 U.S. at 349, *see also Kregos*, 937 F.2d at 702, 709. That means the question before the Court is whether a reasonable jury could conclude that the manner in which the Edge selected and arranged that information is objectively similar to the manner in which Nelnet chose to express its ideas. *See Feist*, 499 U.S. at 349; *Funkhouser v. Loew's, Inc.*, 208 F.2d 185, 189 (8th Cir. 1953) (citations omitted).

When evaluating the similarity of factual works, such as college prep material, similarity of expression generally must amount to nearly verbatim reproduction or, at the very least, close paraphrasing before a factual work will

be deemed infringed. *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485, 488 (9th Cir. 1984). That is true, because subsequent authors wishing to express the ideas contained in a factual work often can choose from only a narrow range of expression. *Id.*

After careful review of the record, the Court concludes that a reasonable juror could determine that Nelnet duplicated the selection, coordination, and arrangement of the ideas in the Edge's manuscript. *See Feist*, 499 U.S. at 349, *see also Kregos*, 937 F.2d at 702, 709. To begin with, many of Nelnet's headings and the overall organization structure closely track the Edge's headings and organization. For example, both the Edge's manuscript and Nelnet's final publication include the following headings in the introductory portion of the works.

| The Edge's Manuscript | Nelnet's ACT Prep Guide |
|---|---|
| Overview of the book structure | How This Book is Organized |
| How to Use This Book | How to Use This Book |
| What is the format of the ACT | What's on the ACT |
| When Should I Take the ACT | When and how Often to Take the ACT |
| How Many Times Should I Take the ACT | When and how Often to Take the ACT |
| General Study Skills and Strategies | General Study Strategies |

*Compare* filing 112-25 at 4-10 with filing 103-4 at 170.

Both works also include a designated area at the end of various sections that highlight aparticular ideas deserving extra emphasis. For instance, the Edge used a "tip box" to emphasize certain topics or common errors, filing 95-10 at 12, 31, while Nelnet uses an "alert" to highlight common mistakes,

19

*compare* filing 103-4 at 9. In one of the Edge's tip boxes, the Edge told students to never leave a question blank. Filing 95-20 at 11. And Nelnet used its "alert" box to express a similar idea—that it should never leave a question blank because "any answer, even a guess, is better than none!" Filing 103-4 at 22.

There are also instances where Nelnet's final publication includes the exact same wording to describe an idea that exists in the Edge's initial manuscript. For instance, the following sentences appear in the parties' respective works.

| The Edge's Manuscript | Nelnet's ACT Prep Guide |
|---|---|
| "While taking as many practice tests as you can is always a good thing, it's definitely not an effective exercise unless . . . | "While taking as many practice tests as you can is always a good thing, it's definitely not an effective exercise unless . . . " |
| "Now that you've learned some basic study skills and test-taking strategies, you're going to want to make a study plan to tackle all of this material." | "Now that you've learned some tried-and-true study skills and strategies, you're going to want to make a study plan to tackle all of this material." |
| "On the next few pages, you will find sample plans based on how much time you have before your test date." | "On the next few pages, you will find study plans based on how much time you have before your test date." |

*Compare* filing 112-25 at 9 with filing 103-4 at 10, 17, 19.[5]

---

[5] The Court notes that Nelnet argues that it removed at least some of this language from subsequent editions of the ACT Prep Guide. Filing 100 at 18. But even assuming that is true, summary judgment is still not warranted.

Nelnet's selection of examples in its English portion also closely resemble the examples chosen by the Edge—despite the fact that there are several other words that could illustrate the same grammatical principle. For instance, when demonstrating the use of apostrophes for a possessive word that ends in the letter "s" both works used the phrase "the bus' wheels." Filing 112-25 at 14; filing 103-4 at 145. The word "committee" is used in both works as an example of a collective noun. Filing 112-25 at 15; filing 103-4 at 152. And the words "more" and "most" demonstrate superlative and comparisons in both works. Filing 112-25 at 15; filing 103-4 at 156. When explaining correlative conjunctions, both works use the same examples—"either…or", "neither….nor", and "not only…but also". *Compare* filing 112-25 at 17 *with* filing 103-4 at 178. Lastly, in its section on idioms, not only are both works arranged in nearly identical fashions—first, by giving a general explanation of idioms followed by a list of common idioms, *compare* filing 95-20 at 101 *with* filing 103-4 at 170, but the similarities go as far as expressing the idea that, as a concept, idioms are more difficult for non-native English speakers. Nelnet's list of idiom examples also use nearly all, if not all, of the idioms used in the Edge's initial manuscript. *Compare* filing 95-20 at 101 with filing 103-4 at 170.

Based on the foregoing, a reasonable juror could certainty conclude that arrangement and selection of information in the two works are objectively substantially similar. *Hartman v. Hallmark Cards,* Inc., 833 F.2d 117, 120–21 (8th Cir. 1987). Accordingly, the Court will proceed to the intrinsic part of the substantial similarity test.

### *(ii) Intrinsic Similarity*

The intrinsic portion of the two-part test is satisfied if the total concept and feel of the works in question are substantially similar. *Id.*; *see Taylor,* 315

F.3d at 1043. To support why, in its view, the two works are not intrinsically similar, Nelnet argues, among other things, that Nelnet's works are "finished, bound, printed, and published" whereas the Edge's are not. Filing 101 at 43. And Nelnet also claims that its publication "reflect[s] the care and attention of professional editors" and is free of "typos, grammatical errors, or incorrect lessons" and the Edge's manuscript is not. Filing 101 at 43.

In other words, Nelnet argues that because its manuscript is published, the look and feel of the two works cannot, as a matter of law, be substantially similar. The Court is not convinced. After all, the entire purpose of copyright protection is to prevent publishers from publishing other people's copyrighted manuscripts. And it would be absurd if a copyright claim could be defeated by pointing out that the final work was actually published. The fact of publication weighs in favor of the copyright claim, not against it.

Instead, the proper focus is on intrinsic similarities between the "total concept" and "feel" of the two works. *See id.* Here, after comparing the overall "concept" and "feel" of the two works, the Court concludes that a reasonable jury could determine that Nelnet's publication is substantially similar to the Edge's manuscript. Indeed, both works generally purport to provide students studying for the ACT with an overview of the ACT, and provide each student with specific lessons and teachings that might help that student excel or improve his or her ACT score. *Compare* filing 112-25 at 1-35 *with* filing 103-4 at 1-25. Both works include an introductory section where the author explains the purpose of the book, how it's organized, the format of the ACT, a brief explanation of the five sections of the ACT, when to take the ACT, how many times to take the ACT, how the ACT is scored, and the concept of super scoring. *Compare* filing 112-25 at 3-5 with filing 103-4 at 8-34. And both works also provide general study habits and strategies students should adhere to.

After the introductory material, the Edge's manuscript also included an English portion of the manuscript. There, the Edge took common English topics, such as idioms and transitions, and briefly explained them before providing the reader with a list of common idioms or transitions. Filing 95-20 at 102; 108. Nelnet's final publication also organized its English section in a similar way—by briefly introducing the topic at hand before providing the reader with a list of common examples related to that concept. Filing 103-4 at 170.

Based on that evidence, a reasonable fact finder could conclude that the works, when considered in their entirety, discuss similar ideas, in similar contexts, with the exact same overall purpose. *See Funkhouser*, 208 F.2d at 190. Accordingly, the Court finds that there are genuine disputes of material facts on the issue of substantial similarity. As such, the Court will deny Nelnet's summary judgment on the Edge's copyright infringement claim.

### *(iii) Damage Calculation*

The Edge also moves for summary judgment on Nelnet's gross revenue evidence. Filing 94 at 14. Nelnet does not dispute those numbers, but it does correctly point out that gross revenues generated by various editions of the allegedly infringing work is not the final measure of damages. Filing 116 at 18. A prevailing plaintiff in an infringement action is entitled to recover the infringer's profits to the extent they are attributable to the infringement. 17 U.S.C. § 504(b); *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,* 772 F.2d 505, 514 (9th Cir. 1985). In establishing the infringer's profits, the plaintiff is required to prove only the defendant's sales; the burden then shifts to the defendant to prove the elements of costs to be deducted from sales in arriving at profit. 17 U.S.C. § 504(b). If the infringing defendant does not meet its

burden of proving costs, the gross figure stands as the defendant's profits. *See Russell v. Price*, 612 F.2d 1123, 1130-31 (9th Cir. 1979), *cert. denied*, 446 U.S. 952 (1980).

With those principles in mind, the Court will grant the Edge's motion for summary judgment on Nelnet's gross revenue calculation with the caveat that at trial, not only will Nelnet be permitted to offer evidence of the costs and expenses deductible from those sales, it will be its burden to do so. 17 U.S.C. § 504(b); *Frank Music Corp.*, 772 F.2d at 514.

## IV. NELNET'S AFFIRMATIVE DEFENSES

As a final matter, the Edge moves for summary judgment on virtually all of Nelnet's affirmative defenses. Nelnet does not oppose some of that motion. For example, Nelnet agrees that its first, second, sixth, seventh, eighth, and thirteenth affirmative defenses should be dismissed. Filing 116 at 24. And the Edge has apparently withdrawn its motion for summary judgment with respect to Nelnet's third and fifth affirmative defenses. Filing 120 at 2. But, the Edge does claim that it is, nonetheless, entitled to summary judgment on two of the Edge's affirmative defenses—equitable estoppel and statute of limitations. Filing 120 at 2.

Procedurally, however, the Edge's motion is better classified as a motion to strike Nelnet's affirmative defenses. *See GGA-PC v. Performance Eng'g, Inc.*, No. 8:16-CV-567, 2017 WL 2773532, at *2 (D. Neb. June 26, 2017). Under Fed. R. Civ. P. 12(f), courts may strike "from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Courts enjoy liberal discretion to strike pleadings under this provision. *BJC Health System v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007). Striking a party's pleading, however, is an extreme and disfavored measure. *Id.* A motion to

strike an affirmative defense may be granted where the defense has no basis in law, is insufficient as a matter of law, and the moving party will suffer prejudice in the absence of the court granting its motion to strike. *See United States v. Dico, Inc.*, 266 F.3d 864, 880 (8th Cir. 2001).

The Court finds that the Edge has not satisfied this high burden at this time. Whether the Court will actually *instruct* on Nelnet's respective affirmative defenses is a question that the Court will take up based on the evidence adduced at trial. Until then, Nelnet's affirmative defenses will not be stricken, and the Edge's motion on this matter will be denied.

## CONCLUSION

In sum, the Court will grant the Edge's motion for summary judgment in part and deny it in part. Specifically, the Court will grant the Edge's motion with respect to the portions of that motion not disputed by Nelnet—namely, the gross revenue calculations and the undisputed affirmative defenses. But the Court will deny the Edge's motion for partial summary judgment with respect to Nelnet's breach of contract counterclaim. There are several disputes of material fact on the Edge's breach of contract and copyright infringement claim. So, Court will also deny Nelnet's motion for summary judgment with respect to those issues in its entirety.

IT IS ORDERED:

1.  The Edge's motion for partial summary judgment (filing 93) is granted in part and denied in part as set forth above.

2.  Nelnet's motion for summary judgment (filing 99) is denied.

Dated this 8th day of August, 2019.

BY THE COURT:

John M. Gerrard
Chief United States District Judge